STAAK, by her guardian, vs. SIGELKOW, impleaded with
MANSFELD.

A verified answer in an action under the Code, is not evidence for the defendant, as was an answer under oath under the former practice in equity.

Though a deed be made to a party by a wrong baptismal or christian name, the grant is good and the title vests in the intended grantee. The uncertainty as to the person of the grantee, does not in such case appear upon the face of the deed, but is caused by extrinsic evidence, and is therefore susceptible of explanation or removal by parol proof.

The title of such grantee is not affected by a deed of conveyance of the land made by a stranger *in the name* by which such grantee was wrongly designated, although the party receiving such deed, while knowing that the stranger was executing such deed in a name not his own, was ignorant that there was a mistake of the christian name in the first mentioned deed, and ignorantly supposed that such stranger had authority from the true owner of the land to convey the same, and under that belief, paid him the full value thereof.

APPEAL from the Circuit Court for *Dane* County.

This was an action to recover a tract of land in Dane county. The complaint alleged that in the lifetime of Arnold Staak (of whom the infant plaintiff is sole heir,) said

Arnold delivered to said *Mansfeld* a certain sum of money for the purchase of said land; that *Mansfeld* purchased the land for said Arnold, but by mistake or with a fraudulent intent, took a deed conveying said premises to "*Louis* Staak," instead of to "*Arnold* Staak," which deed was dated September 3d, 1853; that there was no such person as *Louis* Staak; that shortly after the death of said Arnold, said *Mansfeld* undertook to convey the land to the defendant *Sigelkow*, by deed purporting to be signed and acknowledged by *Louis* Staak, but really signed, and if acknowledged at all, acknowledged by said *Mansfeld*, the said *Sigelkow* well knowing at the time that the land did not belong to said *Mansfeld*, but to the heirs of said Arnold Staak, and that said Louis Staak was a fictitious person; that *Sigelkow* has, since the date of said deed, occupied the premises. Prayer, that *Sigelkow* may be adjudged to deliver up to plaintiff the possession of the said land; that said pretended deed of conveyance to *Sigelkow* be declared void, &c.

The defendant *Mansfeld* did not appear or answer the complaint.

The defendant *Sigelkow*, by his answer, denies any knowledge or information sufficient to form a belief, whether said *Arnold Staak*, ever delivered any money to said *Mansfeld*, for the purpose of purchasing any land whatever. He admits that he purchased the land described in the complaint from said *Mansfeld*, but avers that the title to the same was in one Louis Staak, and that *Mansfeld* represented to the defendant that he had full power to sell and convey the land, and the defendant, being ignorant of the manner in which land should be conveyed, or of the power necessary to authorize said *Mansfeld* to make a conveyance, took the deed executed by said *Mansfeld* in the name of Louis Staak, paying him therefor the sum of $650, believing that said *Mansfeld* had the legal right to sell and convey said land. He denies that he had any information at the time of said conveyance, that said land did not belong to said *Mansfeld*, or that he had not full power to sell and convey, or that the same belonged to the heirs of Arnold Staak, but avers, on the contrary, that he had no knowledge or information be-

fore this suit was brought, that said Arnold Staak, or his heirs, ever had, or claimed to have, any interest in the land, or in the money with which the same was purchased.

The complaint and answer were both verified.

Catharine Straasburger, formerly the wife of Arnold Staak, and who was a sister of *Mansfeld*, was the only witness in support of the complaint. The facts testified to by her, are stated sufficiently in the opinion of the court.

The circuit court decided, "that the testimony of Mrs. Straasburger alone, particularly in a chancery case as this was, would not be sufficient to support the complaint, so far as it was denied under oath by the answer of the defendant *Sigelkow*, and that, therefore, the complaint in this action must be dismissed;" to which decision and finding of the court the plaintiff excepted, and judgment being entered accordingly, the plaintiff appealed.

*Smith & Salomon*, for appellant:

1. The answer of a defendant, whether under oath or not, is not entitled to any weight whatever now as a matter of evidence.

2. *Sigelkow* cannot be regarded as a *bona fide* purchaser. He bought the land of *Mansfeld*, who was neither the real nor apparent owner of it. This is not a case of a resulting trust, but a case where, by mistake or fraud, the name of a grantee in a deed was incorrect. A mistake in the christian name may be shown by parol. *Fletcher vs. Mansur*, 5 Ind., 267; *Morse vs. Carpenter*, 19 Vt., 613; *Price vs. Page*, 4 Ves., 680; *Miller vs. Travers*, 21 E. C. L., 288; *Connolly vs. Pardon*, 1 Paige, 291; *Beaumont vs. Fell*, 2 P. Wms., 140; *Thomas vs. Stevens*, 4 Jac., 607; *Smith vs. Doe*, 6 E. C. L., 207, 244.

*Spencer & Firmin*, for respondent:

1. The proof fails to connect *Sigelkow* in any manner with the frauds charged upon *Mansfeld*, and fails to show that he had any notice of the claim of the plaintiff, or that the title was otherwise than it appeared to be on the face of the deed. The plaintiff has no right to have the deed reformed by inserting the name of Arnold Staak as grantee, instead of Louis Staak. A mistake that a court of equity

may correct, must be a mistake of both parties to the con-
tract, and must be clearly proved. 2 Ames, R. I. Rep., 130;
1 Story's Eq. Jur., §§ 152, 157; 5 Mason, 575, 577. A mis-
take in a written instrument will not be corrected to the
prejudice of innocent parties who have no notice of the mis-
take. *U. S. vs. Munroe*, 5 Mason, 578; *Kesler vs. Zimmer-
schitte*, 1 Texas, 50. A court of equity will not interfere in
case of a mistake in written instruments as against *bona fide*
purchasers for a valuable consideration without notice, be-
cause they have at least an equal claim to the protection of
the court. 1 Story's Eq. Jur. § 165; *Whitman vs. Weston*,
30 Maine, 285. *Sigelkow* is a purchaser for a valuable con-
sideration, without notice, and is entitled as such to protec-
tion.

2. The credibility of the only witness for the plaintiff is
affected by the fact, that if a recovery is had, she becomes
entitled to dower in the land. She testifies that she was sick
at the time Arnold Staak gave *Mansfeld* the money to buy
the land, and *Mansfeld* is just now conveniently missing.

3. If Louis Staak is a fictitious person, then the legal title
to the land in question is in the *grantors* in the deed, and the
respondent, having a superior equity, has a right to call upon
them for a conveyance that will invest him with a legal title.
2 Leading Cases in Equity, part 1, p. 70.

*By the Court*, DIXON, C. J. There is a vast difference be-
tween a verified answer according to the provisions of the
Code of Procedure, and an answer under oath according to
the practice which formerly prevailed in courts of equity, in
respect to their effect as evidence in the action. The latter
was evidence, but the former is not. Under the former
system the bill could be so framed, with proper charges and
interrogations, as to operate not only as a statement of the
complainant's cause of action, but also as a complete and
searching examination of the defendant as to all facts within
his knowledge, or upon which he had any information or be-
lief, which would tend to make out or sustain the same.
The object was to search his conscience, and, in many in-
stances, to lay the foundation for, and establish the com-

plainant's claim for relief upon facts of which he alone was cognizant. The necessity for such a proceeding arose from the fact, that in no other way could his testimony be obtained. He was incompetent, and could not be called upon to give evidence in the manner in which disinterested persons were. Hence the complainant was allowed to so draw his bill as not only to concisely state his claim or demand, but likewise to embrace in it various collateral matters of fact, which, though not strictly pertinent as matters of pleading, were deemed necessary as evidence going to support such claim or demand, and to put questions to the defendant concerning them, to which he was bound, under oath, to respond. But the machinery of complaining and answering fixed by the code is quite different, and renders these things impossible.

The distinction between actions at law and actions in equity, and the forms of pleading in the same, is abolished, and the complaint in all cases must be "a plain and concise statement of the facts constituting a cause of action, without unnecessary repetition."

The answer too must not embrace matters which, though pertinent as evidence, would not be so as pleading, but "must contain a general or specific denial of each material allegation of the complaint controverted by the defendant, or of any knowledge or information thereof sufficient to form a belief," or "a statement of any new matter constituting a defense or counter claim, in ordinary and concise language, without repetition."

It is very evident from these provisions, that it was not the intention of the legislature that the complaint should be so framed as to draw from the the defendant a statement of any facts collateral to, though bearing upon, the main issue; nor that the answer should set forth any such facts. In abolishing the system of pleadings which formerly prevailed, the legislature at the same time removed the necessity for this species of examination, by providing, that in all cases the opposite party may be examined at the trial, or his testimony taken as in the case of any other witness, thereby furnishing a more direct and satisfactory mode of enabling each

party to obtain the evidence and probe the conscience of his adversary. The reason of the old chancery rule has, therefore, ceased to exist. The object of allowing the plaintiff, by a verification of his complaint, to compel the defendant to swear to the truth of the matter contained in his answer, undoubtedly was to simplify the issue by confining it to the real facts in controversy, and to rid the case of false and sham defenses, which might otherwise be put in, for the purpose of delaying the plaintiff in the speedy acquisition of his rights, and was not to enable the parties to use the answer as evidence, except so far as it contained admissions of the plaintiff's cause of action, in which respect it would have the same effect as any other admissions of a judicial character. We are therefore of opinion that the verified answer of a defendant in a civil action instituted under the code, is not evidence for him as such an answer was under the former practice in equity, and which could only be overcome by the testimony of two witnesses, or of one witness and clear corroborating circumstances, but that in this respect it is to be treated like any other pleading.

The evidence in the case conclusively shows that Arnold Staak, deceased, of whom the plaintiff is sole heir at law, furnished and delivered to the defendant *Mansfeld* (who, for the purpose of effecting a bargain for and procuring a conveyance to him of the land in question, undertook to act as and did in fact become his agent,) the entire purchase money, save a very small portion, which, soon after his death, (which happened shortly after the trade was perfected,) was paid over to him by the widow, with money realized from the estate; and that the money so furnished and delivered, was in fact applied by *Mansfeld* to the purposes intended. It likewise as conclusively appears that *Mansfeld*, either by mistake or intentionally, and which, it is unnecessary, for the purposes of this action, to inquire, took the conveyance in the name of *Louis* Staak instead of *Arnold* Staak. The deed thus executed and recorded in the county of Dane, was taken by *Mansfeld* from there to the city of Milwaukee, (where Staak lived, and at which place he soon after died,) and delivered to him. On receiving the

deed Staak discovered the discrepancy in the name; he called *Mansfeld's* attention to it, and was told by him that it was accidental and occasioned by reason of his being ignorant of the true name. The deed, after having remained a short time in Staak's possession, was by him delivered to *Mansfeld*, to be taken by the latter to the county of Dane for the purpose, as the parties ignorantly supposed, of enabling him, in behalf of Staak, to execute a mortgage of the land to one of Staak's creditors to whom he owed $100, which he was desirous of securing in this way. *Mansfeld* never afterward returned the deed, and never executed or attempted to execute the mortgage, as it was believed he might, but in February, 1854, and upwards of a year after Staak's death, sold the land to the defendant *Sigelkow*, receiving a valuable consideration therefor, and executed and delivered to him a conveyance signed and acknowledged by himself in the name of Louis Staak. There was not, to the knowledge of any of the parties, any such person in existence as Louis Staak. This *Sigelkow* knew, but he did not know that Arnold Staak paid the purchase money or was the person beneficially interested. He was well acquainted with *Mansfeld*, and knew his full name, and that it was *not that by* which he signed and acknowledged the deed, but in ignorance of the law, he was induced to believe that the title to the land could thus be passed.

It is obvious that the first question to be determined is, whether, by virtue of the deed executed to Louis Staak, the title of the land passed to Arnold Staak, the intended grantee. We are clearly of the opinion that it did. It is to be observed that the whole transaction shows that he was the person really intended. *Mansfeld* was his agent for the express purpose of buying the land; he furnished the purchase money; the deed, soon after its execution, came into his possession; his surname was correctly set forth in the deed, and so far he was properly described by it; and there was no such person in existence as Louis Staak, for whom it could have been intended. These circumstances seem to place the intent beyond a doubt, and the question arises whether the disagreement or mistake in the baptismal or christian name

can be explained by parol testimony, so as to give effect in law to the deed. We think it may; that it is a latent ambiguity which is susceptible of explanation by parol proof. It is certain that the deed upon its face gives rise to no doubt or uncertainty, which proves that the ambiguity is latent and not patent. But on looking around for the person of the grantee to whom to apply it, a difficulty arises; we find no such person in existence as Louis Staak; and to explain or remove the difficulty or uncertainty thus brought in by the introduction of extrinsic evidence, further proof as to the person really intended, may be received. Such evidence, when admitted, does not tend to impeach or contradict the deed, but to support and uphold it by removing the doubts arising from external circumstances, and applying the grant to the person for whose benefit it was intended. Chief Justice TINDAL, in applying the maxim, *"ambiguitas verborum latens, verificatione suppletur,"* to the case of a will, in *Miller vs. Travers,* 8 Bing., 244, (21 E. C. L., 288,) states the general doctrine of the law as applicable to all written instruments with great force and clearness. He says: "But the cases to which this construction applies will be found to range themselves into two separate classes, distinguishable from each other. * * * The first class is, where the description of the thing devised, or of the devisee, is clear upon the face of the will; but upon the death of the testator it is found that there are more than one estate or subject matter of devise, or more than one person, whose description follows out and fills the words of the will. As where the testator devises his manor of Dale, and at his death it is found that he has two manors of that name, South Dale and North Dale; or where a man devises to his son John, and he has two sons of that name. In each of these cases respectively, parol evidence is admissible to show which manor was intended to pass, and which son was intended to take. (Bac. Max., 23; Hob. Rep., 32; *Edward Altham's case,* 8 Rep., 155.) The other class of cases is that in which the description contained in the will, of the thing intended to be devised, or of the person who is intended to take, is true in part but not true in every particular. As where an estate is devised called A,

VOL. XII—16

and is described as in the occupation of B, and it is found that though there is an estate called A, yet the whole is not in the occupation of B; *or where an estate is devised to a person whose surname or christian name is mistaken,* or whose description is imperfect or inaccurate, in which latter class of cases parol evidence is admissible to show what estate was intended to pass, and who is the devisee intended to take, provided there is sufficient indication of intention appearing on the face of the will to justify the application of the evidence." Certainly enough appears on the face of the deed in this case to authorize the application of the rule here laid down. The surname of the grantee is correctly stated, and the circumstances in evidence by the parol proof put the intention beyond doubt. The question here involved was directly raised and decided in the case of *Connolly vs. Pardon,* 1 Paige, 291, in which it was held that where a testator made a bequest to a person by a wrong christian name, parol evidence was admissible to show what person was intended. See also *Fletcher vs. Mansur,* 5 Ind., 267; *Morse vs. Carpenter,* 19 Vt., 613; *Price vs. Page,* 4 Ves., 680; *Beaumont vs. Fell,* 2 P. Wms., 607; *Thomas vs. Stevens,* 4 Jac., 607; *Smith vs. Doe,* 6 E. C. L., 244; and 3 Cowen & Hill's notes, No. 938, pp. 1358–78.

To the same effect is the author of the Touchstone. He says, (p. 236): "Regularly it is requisite that the grantee be named by his names of baptism and surname, and so it (i. e. this mode) is most safe; and special heed must be taken to the name of baptism, for that a man cannot have two or more names of baptism as he may of surnames (Godb., 17; 3 Newn., 38); and yet in some cases, though the name be mistaken, the grant is good (Bro. Nosme., 9); as if a grant be to I. S. and Em his wife, and her name is Emelin (Bro. Conformation, 30); *or a grant is made to Alfred Fitzjames by the name of Ethelred Fitzjames* (Co. 6, 65; 27 E., 3, 85); or a grant be to Robert, Earl of Pembroke, where his name is Henry; or to George, Bishop of Norwich, when his name is John (Co. super Lit., 3); or a grant be to a mayor and commonalty, or a dean and chapter, and the mayor or dean is not named by his proper name (Dyer, 119); or a grant be to

I. S., wife of W. S., (Hob. 32), where she is sole (3 Taunt., 342); all these and such like grants are good; for in this case the rule doth hold, *utile per inutile non vitiatur;* and *nil facit error nominis cum de persona constat.* Co. super Lit., 3."

June Term, 1860.

The title of this land therefore vested, on the execution and delivery of the deed to *Mansfeld,* in Arnold Staak, the ancestor of the plaintiff, and upon his death passed by operation of law to her. Consequently she was seized at the time *Mansfeld* attempted to convey to the defendant *Sigelkow.* This seems to be the end of the case; for it is hardly necessary for us to add that *Mansfeld* could not transfer the title to *Sigelkow* at the time of the execution and delivery to him of the pretended conveyance; and in this view it can make no difference whether *Sigelkow* acted in ignorance of the law, or in good or bad faith, for in neither event could he have received anything by the deed.

The judgment of the circuit court must therefore be reversed, and the cause remanded for further proceedings in accordance with this opinion.

